So, we'll hear argument first in case number 21-18-21, in re, Bicom NY. Mr. Dunnigan. Good morning, Your Honor. I'm Bill Dunnigan. I represent the liquidation trustee. I'd like to make two points today. The first concerns statutory construction of the term initial transferee. The second is a practical concern. Now, turning to the issue of what does the statute mean by the term initial transferee, I think everyone agrees that there are at least three elements of that. One, there has to be a receipt of some sort of funds. Second, there has to be control over those funds. And third, there has to be the lack of an obligation to transfer those funds either contractually or statutorily to someone else. The issue before the court is whether or not there is any other additional requirement for an initial transferee. We suggest there is not. Now, their best argument is probably that there is some state of mind requirement. They make arguments about a check. They make arguments about duration. But I think this case, if it's going to turn in their favor, it's going to turn on the issue of whether or not there's a state of mind requirement for an initial transferee. Now, reading the statute, it seems to be clear that it is not. Let's take the phrase itself. That phrase has no state of mind requirement. It doesn't say knowingly. It doesn't say willfully. It simply says initial transferee. What's the difference between an initial transferee and a mere conduit? Under the Finley-Campbell case, the mere conduit is someone who has—they receive the money. They have control of the money. But they have an obligation to transfer that money under a contract to someone else. They are a conduit. An initial transferee is someone who meets the requirements of they receive the money. They have no obligation to transfer it to somebody else. They can control it. And we think that's it. And where does that come from? That comes from the plain meaning of the words. It comes from the Bonding case. It comes from the Finley-Campbell case. And it comes, in some respect, from the Red Dot case. It also comes from Section 550B, which if you read it— and we didn't set this out in our brief as well as we should have. But 550B provides that if you were— This is a joint account, right? This is a joint account. So why isn't it attributable to the other person on the joint account? Or is it attributable to both in your view? Why isn't it just attributable to him? No, we think that they are both initial transferees. No, I asked you a different question. I said, why isn't it attributable just to him? He was the one that had the money directed into the account, wasn't he? Yes, but see, she owed— So I have a joint account with Judge Park, and I put $5,000 in that account. I kind of think of that as my money. You know, I may trust Judge Park not to draw on it. He's a trustworthy fellow, but maybe it's not fair to use Judge Park. I apologize to him for doing that, but it's still my money. The distinction you're making is I think once it's in the joint account, it becomes both parties' money. Now, the mistake that she made—this is my practical point— she set that account up so that either she could take the money out or Mr. Milva could take the money out. Now— But isn't that—that argument of yours I'm troubled by because the idea that if she had put together some safeguards and made it so that she had to sign, well, he forged her signature on it already. So, I mean, that clearly wouldn't have— Well, I'm not sure that that's right because under the UCC, unless you sign your name, you're not going to be liable. If someone forges a signature on your check, you go to the bank, you say, that's not my signature, and the bank will pull the money back into your account. You seem to be arguing for a different rule, though. Despite the fact that I don't think you're disputing that she didn't— there's no evidence she had knowledge that the money was even in the account, you're saying she didn't sign anything, she didn't know the money was in the account, hold her accountable for someone else's fraud. Yes. Yes. Because we think the statute requires that result because if you're an immediate transferee and there's no state of mind, there's no good— Does that seem equitable to you? Aside from what the statute requires, to hold someone responsible for— Well, if we're talking about pure equity, the liquidation trustee represents a lot of people who lost a lot of money and they didn't know anything about this transfer. And she didn't know anything about this transfer. I agree, but I think if you're looking at pure equity, it should come down to the issue of whether or not she could have avoided this transaction. And she could have avoided it by saying double signatures on the account. That would have solved this problem entirely. She did nothing wrong, though. There was no requirement for her to set up her finances in some way that would ensure that her friend wouldn't defraud her. I mean, that seems equitable to you, that someone who is not alleged to have engaged in any wrongdoing should be held accountable? Well, you drive defensively, which means you watch out for what other— you watch out for things that can happen to you that you don't expect. If you're a Ph.D., a multimillionaire, trying to gain access legally through the immigration process in this country, it seems to me that you should be— If she wasn't a Ph.D. and if she wasn't a millionaire, I mean, that shouldn't impact what the argument is, correct? I mean, even if she only had $5,000 in the account and never went to college, under your view, she's accountable. It still doesn't matter because she— under the scheme that Congress has set up, the state of mind just does not matter. It matters what—I mean, if you're an immediate trustee, an immediate transferee under 550B, then it matters. Good faith can be a defense in that situation. But in a situation where you are the initial person who receives the money and you're not the mere conduit, like the bank is the mere conduit, you're stuck. That's what Congress set up. You may not like it, but that's a judgment that Congress has made. You've reserved a minute for rebuttal. Thank you. We'll hear from Mr. Dannenberg. Thank you. Good morning. May I please the court? My name is Jeffrey Dannenberg. Am I required to wear the mask? Masks are optional. While you're at the podium, no. Thank you. It came as a surprise to me that in the appellant's reply brief, there was an argument that the Finley-Campbell case was not applicable and determined. Prior to that, both sides had conceded that the Finley-Campbell case was in fact dispositive and, in fact, Judge Wiles in the Bankruptcy Court noted in his decision that both sides stipulated that the case was controllable. So I'm left with this oral argument to respond to that point made in the brief that the recipient of the funds has to have some legal obligation to transfer them in order for the mere conduit test to apply. I suggest respectfully that that represents a misreading of the Finley-Campbell case, which was divided into a background section which discussed the relevant facts and then a discussion section that was divided into two sections. One was called the initial transferee and the other was called the A.A.'s roles in the question transactions. A.N.A. was the broker that transferred the funds to the malpractice carrier. Before you get to mental state, isn't there a difference between theoretical and actual dominion and control? It seems to me that here there was never Mrs. Gryaznova never knew about the money and never had any reason to think that it was there, so it seems only theoretical that she could have exercised control. It's completely theoretical, and we are not arguing that state of mind is some kind of a relevant factor here. Mrs. Gryaznova had no knowledge, and not only that, but it was inconsistent with her agreement with Mr. Nova that he would use the funds for anything. He was supposed to be a nominal owner. What counsel did in the reply brief that the appellant did was it took the conclusion from the second section of the argument portion of Finley-Campbell that discussed the application of the law to the facts, and they applied that conclusion to the first section, which isn't, I suggest, what the court had done there. What the court did in the first section was discuss the origins of the mere conduit test and how other circuits had used the test and said, quote, we joined these circuits in adopting the mere conduit test for determining who was an initial transferee. There's nothing in that section suggesting any limitation that was intended, and the court focused on the inequity of imposing initial transferee status on anyone who may have come into contact theoretically or otherwise. I'm quoting again from that first section of the Finley-Campbell argument. The statutory structure confirms that the term initial transferee refers to something more particular than the initial recipient. Section 550A1 groups initial transferees with entities for whose benefit such transfer was made. So a mere conduit is really just a device, one among other devices courts have used for determining whether there was dominion and control. And if the account, regardless of whether there was a legal obligation to transfer the funds, had funds that were passed through to another entity, that's a device for determining that there was inadequate dominion and control. That's what the court held. One other point I'd like to take issue with in the reply brief was a statement on the bottom paragraph of page 3, in which it was said that Ms. Grieznova, the appellee, had agreed with NILVA that any money in the joint account was hers, and it was a citation to the appendix. That citation, page 17 of the appendix, was from Ms. Grieznova's declaration of the underlying summary judgment motion. What she had actually said there was that, quote, only my money would be kept in the account, close quote. She didn't say that any money that goes into the account is hers. That was inaccurately characterized in the reply brief. So unless the court has any questions, I have nothing to add. Thank you, counsel. Thank you. Mr. Dunnigan, you've got a minute for rebuttal. As to the theoretical practical issue, which I think persuaded Judge Rakoff, as a practical matter, she could have checked the account every day. Now, people wouldn't reasonably do that, but what people would reasonably do is they get alerts from their bank telling you, this is what the transactions happened yesterday. It is not unreasonable for her to say that she had practical control or practical knowledge or could have had practical knowledge if she had set up those alerts to come from the bank. I thought the record was clear that she had no knowledge. She had no actual knowledge, but the question is, was she, like, willfully blind to it? I mean, if the bank offers you, you can have both of you sign checks. Your argument is that it's possible that she might have disregarded a text message saying that a million dollars had been deposited in your account? I don't think most people would do that. Did you check your bank account this morning, counsel? I'm sorry? Did you check your bank account this morning? Actually, I did. I got six emails from Chase telling me the exact balance is in my bank account. So did I. Go ahead. Okay. But, see, the assumption of the bankruptcy court and the district court was she did absolutely nothing that she could have done to avoid this mess. That's not true. Even if you look at it from a practical perspective, she could have avoided this a lot easier than the people that the liquidation trustee represents who lost an enormous amount of money even compared to this amount of knowledge. What she did wrong was didn't check her bank account, unlike you and I. But what he did wrong was forced her name to the account, to the check, deposited it, and then used it, excuse me, forced her name to get it back out and used it to kind of launder the money for an illicit purpose. Right. So she's responsible for his act because she didn't check her bank account in the morning. Everyone agrees that NILDA is a crook, but this isn't a question of her versus NILDA. This is a question of innocent creditors of BICOM versus her. And those innocent creditors. I'm trying to find how it is that she ends up liable because she didn't check her bank account every morning. That's all. Because that's what the statute says, Your Honor. Thank you. Okay. Thank you both. We'll take the matter under advisement.